Dennis F. WHITTAKER, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 6:00–CV–0062(GLS).

United States District Court, N.D. New York.

Feb. 11, 2004.

Jeffrey Freedman Law Firm (Kevin Bambury, Esq., of Counsel), Rochester, NY, for Plaintiff.

Glenn T. Suddaby, United States Attorney (William H. Pease, Assistant U.S. Attorney, of Counsel), Syracuse, NY, for Defendant.

## DECISION AND ORDER

SHARPE, District Judge.

### I. INTRODUCTION

Dennis Whittaker brings this action to contest the denial of benefits by the Commissioner of Social Security. He has been disabled since April 21, 1995, due to glaucoma and diplopia[1]. He met the special insured status earnings requirements of the Act for purposes of establishing entitlement to disability insurance benefits on the alleged date of onset and continued to meet those requirements through December 2001. Having reviewed the entire rec-

ord, this court finds that the Commissioner's decision must be affirmed since it was based on substantial evidence.

### II. PROCEDURAL HISTORY

Whittaker initially applied for disability insurance benefits on November 9, 1995, alleging disability as of August 21, 1995. His application was denied initially and on reconsideration. Whittaker did not appeal the reconsideration decision. Subsequently, on September 25, 1996, Whittaker reapplied for disability insurance benefits alleging disability as of April 25, 1995. The application was denied initially, and again on reconsideration. Whittaker then requested a hearing before an Administrative Law Judge which was subsequently held on April 1, 1998, before Thomas Zolezzi. In a decision dated June 25, 1998, the ALJ found that Whittaker did not have a disability which precluded him from working. The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied his request for review.

On January 10, 2000, Whittaker brought this action pursuant to 42 U.S.C. § 405(g) seeking review of the Commissioner's final determination. On April 18, 2000, the Commissioner filed an answer and a certified administrative transcript. On June 1, 2000, Whittaker filed a brief and on July 18, 2000, the Commissioner filed a response.

### III. CONTENTIONS

Whittaker contends that the Commissioner failed to: (1) introduce sufficient evidence to satisfy its Step 5 burden of proof; and, (2) incorrectly denied his request to reopen his prior application. The Commissioner argues that substantial evidence in the record supports the finding of

---

1. Diplopia is the perception of two images of a single object (double vision). *Dorland's*

*Medical Dictionary* 475 (28th ed.1994).

the ALJ and his decision should be affirmed

## IV. FACTS[2]

Whittaker was born on May 25, 1942. He received a Master's Degree in civil engineering in 1964. He was last employed as an environmental engineer for IBM. His previous job required him to sit for five hours per day, walk for one hour per day, bend occasionally and lift twenty pounds occasionally. His job also required "a lot of" reading and computer work. Whittaker complained of poor near vision in his right eye and difficulty fusing or stabilizing images.

Whittaker claimed that the ALJ who sat ten to twelve feet from him at the hearing, was a blur to him in his right eye. He could not read with his right eye. He usually rested his eyes for 30 minutes per day around noontime. He testified that he got headaches if he did not pace himself. Whittaker indicated that the intraocular pressure[3] ("IOP") in his right eye was 5. The IOP in his left eye was 12 or 13. The pressure in his left eye fluctuated, rising to 20 or 25 every six months, which required him to change medication. The medication allegedly made him tired. His corrected vision varied from 20/60 to 20/80 in his right eye, and was 20/40 in his left eye.

Whittaker performed "normal" activities of daily living, but had difficulty reading labels at the grocery store. His daily activities included cutting and splitting wood, restoring cemeteries, household chores, training his dog to herd sheep and ducks, and visiting relatives. He lived by himself and cooked his own meals. He balanced his checkbook on a computer for 20 to 30 minutes continuously, and then needed a one-hour break. He testified that he could read for ten minutes, but then needed a thirty minute break because he would lose. focus and his eyes would hurt. Whittaker used a magnifying glass to read newspaper articles. He testified that he could work with a jigsaw puzzle, but he could not thread a needle. He did not have any difficulty watching television, except for reading subtitles.

Whittaker drove locally and limited his night time driving. He testified that he had no difficulty standing or walking. However, Whittaker claimed that he could not sit for "too long" due to a bad back. He testified that he could lift fifty pounds occasionally and twenty pounds frequently. He had no difficulty bending, kneeling or stooping down.

### A. Medical Evidence Prior to his Onset Date of April 21, 1995

In 1989, Gary Williams, Whittaker's optometrist since 1974, observed that his IOP began to fluctuate. In January of 1992, his IOP increased to 31 in his left eye and 32 in his right eye. He was referred to Dr. Steven Hudock, who commenced treatment for glaucoma. By February of 1993, Whittaker's IOP had dropped to 11 and 13 in his left and right eye, respectively. However, Whittaker then developed allergic reactions to the glaucoma medication. In September of 1993, his glaucoma care was transferred to Dr. Maura Santangelo, an ophthalmologist. Since Whittaker's IOP could no longer be controlled with medical therapy, Dr. Santangelo performed a trabeculectomy[4] on

---

**2.** Whittaker's counsel failed to include a statement of facts with his brief. The following facts were taken from the administrative record and Commissioner's "statement of facts" (PP. 3–15).

**3.** Normal Intraocular pressure ranges between 11 and 21mm.Hg. *The Merck Manual* 733 (17th ed.1999).

**4.** A trabeculectomy is a creation of fistula between the anterior chamber of the eye and the subconjunctival space by surgical removal

his right eye on October 19, 1993. This produced a dramatic reduction in pressure, a decrease of approximately three diopters in myopia,[5] and a hypotensive maculopathy.[6] On February 28, 1994, Dr. Santangelo surgically revised the filtering bleb in his right eye. The increased IOP partially resolved the maculopathy, but he had three diopters less myopia in his right eye than his left. This produced significant aniseikonia[7]. In June of 1994, Whittaker developed hyperphoria[8] in his right eye.

## B. *Summary of Medical Evidence During the Relevant Period*

On April 27, 1995, a magnetic resonance scan of Whittaker's brain, orbits, and visual pathway was unremarkable. On May 26, 1995, Dr. J. Louis Pecora, an ophthalmologist, examined him. Whittaker indicated that he had vision difficulty since the trabeculectomy. On examination, his best vision was 20/20 in the right eye, and 20/15 in the left eye. The pupils responded normally to light. The IOP was 8 in the right eye and 24 in the left eye. Dr. Pecora's impression was retinal fold in his right eye, primary open angle glaucoma in both eyes, and status post right eye trabeculectomy.

On June 2, 1995, Whittaker saw Dr. William Delaney for an evaluation of the retinal fold. Whittaker complained of double vision and headaches. His chief complaint was that he could not maintain focus. He related that he could get single vision with considerable effort, but it was very tiring. He used ocupress and lopidine twice per day, respectively, in his left eye.

On examination, Dr. Delaney found that Whittaker's best corrected vision was 20/30 in the right eye and 20/20 in the left eye. An external exam revealed right over left hypertropia, worse in left gaze and on right head tilt. Whittaker's visual field was full in the right eye with central distortion, and full in the left eye with no defect noted. Dr. Delaney's impression was anisometropia[9] chloral folds in the right eye, open angle glaucoma, status post filtering surgery in the right eye, spurious hyperphoria and/or superior oblique palsy in the right eye, and segmental optic atrophy of the right eye. He did not recommend any therapy to treat the retinal fold. Dr. Delaney recommended consultation with an ocular muscle specialist for his difficulty fusing images. Finally, Dr. Delaney concluded that Whittaker was seeing

of a portion of the trabecular meshwork, performed to facilitate drainage of the aqueous humor in glaucoma. *Dorland's Medical Dictionary* 1726 (28th ed.1994).

5. Myopia or nearsightedness is the error of refraction in which rays of light entering the eye parallel to the optic axis are brought to a focus in front of the retina as a result of the eyeball being too long from front to back. *Dorland's Medical Dictionary* 1094 (28th ed.1994). A diopter is a unit of refractive power of lenses. *Id.* at 472.

6. Maculopathy is any pathological condition of the macula retinae, increase in pigment of a circular area of the macula retinae, accompanying degeneration. *Dorland's Medical Dictionary* 978 (28th ed.1994).

7. Aniseikonia is a condition in which the ocular image of an object as seen by one eye differs in size and shape from that seen by the other. *Dorland's Medical Dictionary* 85 (28th ed.1994).

8. Hyperphoria is a form of heterophoria in which there is permanent upward deviation of the visual axis of an eye after the visual fusional stimulurs has been eliminated. Heterophoria is the failure of visual axes to remain parallel after the visual fusional stimuli have been eliminated. *Dorland's Medical Dictionary* 763 (28th ed.1994).

9. Anisometropia is a difference in the refractive power of the two eyes. *Dorland's Medical Dictionary* 86 (28th ed.1994).

"well" with both eyes and had difficulty fusing the images.

On August 24, 1995, Dr. Walter Merriam conducted an evaluation. Whittaker complained of double vision in his right eye. Whittaker's vison was 20/40 in his right eye and 20/20 in his left. He had right hyperphoria of 2 diopters. He had very poor fusion movements. Dr. Merriam's impression was metamorphopsia [10] of the right eye. He recommended blurring the right eye so that he would begin to use his left eye predominantly.

On November 28, 1995, Dr. Williams re-evaluated Whittaker. His best corrected distant vision was 20/30 in his right eye and 20/20 in his left. The IOP was 8 in the right eye and 19 in the left. Dr. Williams diagnosed glaucoma/metamorphopsia in the right eye, and glaucoma in the left eye.

On January 8, 1996, Dr. Santangelo completed a report regarding Whittatker's condition. His symptoms during his last visit included distortion of central vison of the right eye. His corrected distant vision was 20/60 in his right eye and 20/20 in the left. Dr. Santangelo diagnosed chronic open angle glaucoma. Dr. Santangelo opined that he had no limitation in his ability to lift, carry, stand, walk, sit, push, or pull. She noted that his visual distortion in the right eye was due to low pressure following glaucoma surgery. The nature of the distortion interfered with his ability to do close work, such as reading.

On February 6, 1996, Whittaker was evaluated by Optometrist Jerome Sherman at the request of Dr. Williams. Whittaker was concerned about images in his right eye which moved up and down, and blurred vision by the presence of a wave-like heat mirage. Dr. Sherman found that his corrected visual acuity was 20/40 in his right eye and 20/20 in his left. The IOP was 7.5 in his right eye and 18 in his left. Visual field testing of his right eye revealed only minor abnormalities. Corneal topography of the right eye was unremarkable. Dr. Sherman concluded that his examination yielded little of substance to the management of his case and suggested that Whittaker totally or partially occlude his right eye.

On February 14, 1996, Dr. Williams provided an assessment of Whittaker's functional limitations. He indicated that Whittaker should avoid concentrated visual attention. He stated that he could not determine whether Whittaker had limitations in any other areas of functioning. On March 4, 1996, Dr. Santangelo completed a disability report on Whittaker's functional limitations. She opined that Whittaker should avoid concentrated visual attention. She clarified that Whittaker could perform work requiring concentrated visual attention for short periods of less than ten minutes.

On October 11, 1996, Dr. Williams re-elevated Whittaker. He observed that his distant vision was 20/70 in his right eye with distortion and movement, and 20/20 in his left eye. Tension was 11 in his right eye and 16 in his left. He diagnosed glaucoma, reduced vision secondary to glaucoma filtering surgery with distorted image and oscillopsia.[11] Dr. Willaims indicated that the surgery caused refractive change and aniseikenia. He stated that non-comitant eye deviation cause most of Whittaker's visual and ocular symptoms of blur, diplopia in different fields, headache, photophobia,[12] and inability to read. He left blank a physical capacity assessment form.

10. Metamorphopsia is a disturbance of vision in which objects are seen as distorted in shape. *Dorland's Medical Dictionary* 1022 (28th ed.1994).

11. Oscillopsia is oscillating vision, a condition in which objects seem to move back and forth, to jerk, or to wiggle. *Dorland's Medical Dictionary* 1196 (28th ed.1994).

12. Photophobia is an abnormal visual intolerance of light. *Dorland's Medical Dictionary* 1287 (28th ed.1994).

On October 15, 1996, in a letter to an insurance company, Dr. Santangelo stated that Whittaker's best corrected vision in his right eye was 20/80. She opined that his vision loss was caused by distortion of his central visual acuity, which created blurring even in his good eye. Patching one eye, which he attempted in the past, did not seem to help. Dr. Santatngelo expected that his condition was permanent. He was not taking medication in his right eye since the pressure was well-controlled following surgery. He took Xalatan and Trusopt in his left eye. On February 3, 1997, Dr. Santangelo re-evaluated Whittaker. His corrected distant vision was 20/60 in his right eye and 20/30 in his left eye. Tension was 4 in his right eye, and 11 in his left eye. She diagnosed him with glaucoma in the left eye, and maculopathy in the right.

On March 25, 1997, Whittaker was examined consultatively by Dr. Charles Rubin. Whittaker related that he took Trusopt, Alphagan, and Xalatan in his left eye. His best corrected distant vision was 20/60 in his right eye, and 20/60 in his left eye. His IOP was 7 in his right eye and 20 in his left eye. Visual field testing was normal. Dr. Rubin opined that he had early cataracts degeneration in both eyes, and glaucoma by history.

On April 4, 1997, a state agency medical consultant reviewed the medical record and concluded that he had limited near acuity, limited depth perception, and limited field of vision. The doctor also opined that he should avoid hazards, such as machinery and driving a car. No exertional or non-exertional limitations were noted.

On October 23, 1997, Michael Lange, an optometrist, evaluated Whittkaer and found five diopters of vertical phoria.[13]

The IOP was 8 in his right eye and 11 in his left eye. Dr. Lange prescribed new glasses. On November 21, 1997, Whittaker told Dr. Lange that the new glasses helped his double vision initially but then the symptoms worsened. When Dr. Lange examined Whittaker, he observed that his vertical phoria had improved to 2.25 and recommended that Whittaker patch his right eye.

On December 11, 1997, Dr. Lange re-evaluated him. Whittaker complained that he could not tolerate wearing the patch because it made him hysterical and claustrophobic. Thereafter, Dr. Lange suggested various ways to partially patch his right eye to decrease his reaction and raised the idea of psychological counseling. On February 12, 1998, a follow-up examination revealed that his condition was unchanged. He noted that symptoms seemed much greater than the test findings indicated.

### C. Medical Evidence Presented to the Appeals Council

Dr. Charles Teitelbaum provided a letter of his examination findings. He observed open angle glaucoma with good IOP control in his right eye but with hypotony maculopathy. He recommended laser surgery on the left eye to correct its narrow angle.

## V. DISCUSSION

### A. Standard of Review

#### 1. Scope of Review

■ A court's review of the Commissioner's final decision is limited to determining whether the correct legal standards were applied and whether substantial evidence supports the decision. *Urtz v. Cal-*

---

13. *See* Heterophoria footnote 6.

*lahan,* 965 F.Supp. 324, 326 (N.D.N.Y. 1997) (citing *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). Although the Commissioner is ultimately responsible for determining a claimant's eligibility, the actual disability determination is made by an ALJ. The ALJ's decision is reviewed by a court after an appeal is filed. A court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if it appears to be supported by substantial evidence. *Johnson,* 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984).

■■ A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *see Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). "Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams ex rel Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also, Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

■ The court has authority to reverse with or without remand. 42 U.S.C. § 405(g). Remand is appropriate where there are gaps in the record or further development of the evidence is needed. *See Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980); *Cutler v. Weinberger,* 516 F.2d 1282, 1287 (2d Cir.1975) (remand to permit claimant to produce further evidence). Reversal is appropriate, however, when there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose. *Parker,* 626 F.2d at 235; *Simmons v. United States R.R. Retirement Bd.,* 982 F.2d 49, 57 (2d Cir.1992); *Carroll v. Secretary of HHS,* 705 F.2d 638, 644 (2d Cir.1983) (reversal without remand for additional evidence particularly appropriate where payment of benefits already delayed for four years and remand would likely result in further lengthening the "painfully slow process" of determining disability).

### B. *Five–Step Disability Determination*

The definition of "disabled" is the same for purposes of receiving Social Security Disability Insurance ("SSDI") and Supplement Security Income benefits (SSI). To be considered disabled, a plaintiff seeking SSDI or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months

...." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[14] The Commissioner uses a five-step process to evaluate disability insurance and SSI disability claims. 20 C.F.R. §§ 404.1520, 416.920. Step One requires the ALJ to determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If a claimant is engaged in SGA, he will not be considered disabled. If the claimant is not engaged in SGA, Step Two requires the ALJ to determine whether the claimant has a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from a severe impairment, Step Three requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P., Appendix 1 §§ 404.1520(d), 416.920(d). If the impairment meets or equals a listed impairment, the claimant is presumptively disabled. *Ferraris*, 728 F.2d at 584. If the claimant is not presumptively disabled, Step Four requires the ALJ to consider whether the claimant's Residual Functional Capacity ("RFC") precludes the performance of his past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Five, the ALJ determines whether the claimant can do any other work. 20 C.F.R. §§ 404.1520(f), 416.920(f).

■ The claimant has the burden of showing that he cannot perform past relevant work. *Ferraris*, 728 F.2d at 584.

However, once the claimant meets that burden, benefits can only be denied by showing, with specific reference to medical evidence, that the claimant can perform some less demanding work. *See White v. Secretary of HHS*, 910 F.2d 64, 65 (2d Cir.1990); *Ferraris*, 728 F.2d at 584. In making this showing, the ALJ must consider the claimant's RFC, age, education, past work experience, and transferability of skills, to determine if the claimant can perform other work existing in the national economy. §§ 404.1520(f), 416.920(f); *see New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir.1990).

In this case, the ALJ found that Whittaker applied for SSDI and satisfied Step One because he had not worked since April 21, 1995.[15] In Step Two, the ALJ determined that Whittaker suffered from glaucoma and diplopia, severe impairments. In Step Three the ALJ determined that Whittaker's impairment failed to meet or equal a combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P., Regulations No. 4. In Step Four, the ALJ determined that Whittaker did not have the RFC to perform his past relevant work as an environmental engineer. In Step Five, the ALJ found that Whitaker had the RFC to perform the physical exertion and non-exertional requirements of all levels of work except for working with heights, reading material with fine print, and driving.

14. In addition, a claimant's
   "Physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B)
   Therefore, a plaintiff must not only carry a medically determinable impairment but an impairment so severe as to prevent him from engaging in any kind of substantial gainful work which exists in the national economy.

15. He had post-onset earnings as a result of vacation pay, sick pay and regular pay, which was received under the claimant's employer's policy of paying sick pay for one year.

## C. *Residual Functional Capacity*

### 1. *Standard of Review*

Residual Functional Capacity relates to what a claimant is capable of doing despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is determined by considering all of the relevant evidence consisting, *inter alia*, of physical abilities, symptoms including pain,[16] and descriptions, including that of the claimant, of limitations which go beyond symptoms. 20 C.F.R. §§ 404.1545, 416.945. Physical abilities are determined by evaluation of exertional and non-exertional limitations in performing a certain category of work activity on a regular and continuing basis. *Id.; see also,* 20 C.F.R. §§ 404.1569(a), 416.969(a).

Thus, to determine whether a claimant can do a certain category of work, the ALJ must determine the plaintiff's strength limitations, or exertional capacity, which include the ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1569a(a), 416.969a(a). The ALJ must also evaluate a claimant's non-exertional limitations. Non-exertional activities include difficulty in functioning due to stress, poor concentration, poor visual acuity, or an inability to remember detailed instructions. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

Moreover, when a claimant's impairment and related symptoms such as pain only impose exertional limitations and the claimant's vocational profile is listed in an Appendix 2 rule, the rule is applied directly to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). Age, education, past work experience, and transferability of skills are vocational factors to be considered in assessing the RFC. Age, as a vocational factor, is separated into categories of "younger person", "person approaching advanced age", and "person of advanced age." 20 C.F.R. §§ 404.1563, 416.963.

As a vocational factor, education indicates the ability to meet job requirements such as reasoning, communication and arithmetic. 20 C.F.R. §§ 404.1564(a), 416.964(a). A person with an education above high school is generally considered capable of semi-skilled work through skilled work. 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4). Similarly, recent work experience may indicate an ability to do a similar kind of work. 20 C.F.R. §§ 404.1565(a), 416.965(a). Furthermore, jobs are classified as unskilled, semi-skilled and skilled. 20 C.F.R. §§ 404.1568, 416.968. The degree of transferability of job skills may indicate the type of job a claimant can do which helps to determine if a job the claimant can do exists in the national economy. *Id.*

However, if the impairment and related symptoms, such as pain, only affect the claimant's ability to perform the non-exertional aspects of work-related activities, the rules in Appendix 2 do not direct a conclusion of disabled or not disabled. 20 C.F.R. §§ 404.1569a(c)(2), 416.969a(c)(2). The determination as to whether disability exists will be based on the principles in the appropriate sections of the regulations, giving consideration to the rules of specific case situation in Appendix 2. *Id.* Furthermore, when the limitations and restrictions imposed by the claimant's impairment and related symptoms, such as pain, affect their ability to meet both the strength and demands of jobs, other than the strength demands, the claimant will be considered to have a combination of exertional and non-exertional limitations and the rules in

---

16. Symptoms such as pain are considered when determining the RFC as well as in determining whether a claimant has a severe impairment and at all of the remaining steps in the disability determination. 20 C.F.R. §§ 404.1529(a),(d), 416.929(a),(d).

Appendix 2 will not directly be applied but will provide a framework for disability determination. 20 C.F.R. §§ 404.1569a(d), 416.969a(d).

■ Generally, the RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *LaPorta v. Bowen*, 737 F.Supp. 180, 183 (N.D.N.Y.1990). In assessing the RFC, the ALJ's findings must specify the functions that the plaintiff is capable of performing, and not simply rely on conclusory statements regarding the plaintiff's capacities. *Id.* (citing *Sullivan v. Secretary of Health & Human Serv.*, 666 F.Supp. 456, 460 (W.D.N.Y.1987)). RFC is then used to determine the particular types of work a claimant may be able to perform. 20 C.F.R. §§ 404.1545(a), 416.945(a).

■ In this case, Whittaker argues that the Commissioner failed to prove that there was other gainful work in the national economy that he could perform. He argues that since his work as an engineer was sedentary and the ALJ found that he could no longer perform his past relevant work, there has been an erosion of his ability to perform the entire range of sedentary work. Whittaker maintains that the ALJ failed to cite examples of occupations or jobs that he could do. Moreover, Whittaker argues that the ALJ failed to consider his age, education, and work experience when he found him capable of working.

The Commissioner argues that the ALJ properly relied on the Grids as a framework. The ALJ noted that Whittaker was of advanced age with eighteen years of education and a RFC for all work except working with heights, reading material with fine print, and driving. The ALJ then applied these factors to Rule 204.00 of the Grids which directed a conclusion of not disabled.

The Commissioner argues that the ALJ's finding that Whittaker could perform all levels of physical work is supported by substantial evidence. As the ALJ pointed out, no medical source found that he could not perform at all levels of work. However, the record makes clear that he had some limitations. For instance, Dr. Santangelo opined that his visual distortion precluded close work, such as reading. However, she opined that he had no limitations to lift, carry, sit, stand, walk, push, or pull.

In addition, Dr. Williams found that he had limitations with commuting and the need to avoid concentrated visual attention. Dr. Lange observed that his symptoms appeared to be greater than the test results. The State Agency program physician made findings that he suffered no exertional limitations. He did find limitations in near acuity, depth perception, and field of vison and suggested that he should avoid environmental hazards such as working with machinery. The ALJ gave credit to the state agency physician's findings but specifically rejected the limitation on his field of vision because it was not supported by other medical evidence in the record.

The Commissioner disputes that Whittaker's previous job was sedentary in nature and points out that the record shows that he could perform all levels of exertional activity. Furthermore, the Commissioner points out that the weight he was required to lift in his job exceeded the weight limitation for sedentary work. Whittaker's contention that his previous job was sedentary was erroneous. The ALJ did not find that he had any exertional limitations. However, the ALJ noted that his inability to read fine print caused him not to be able to return to his previous job as an engineer. As such, Whittaker's limitations did not preclude him from all work.

Moreover, Appendix 2 rules state that environmental restrictions ordinarily "would not significantly affect" the range of work existing in the national economy for individuals who, like Whittaker, have the physical capability for heavy or very heavy work. 20 C.F.R. Part 404, Subpart P., Appendix 2, § 204.00. The Commissioner argues that the ALJ's finding that Whittaker had to avoid heights did not significantly diminish his ability to perform a significant number of jobs. Thus, he would be able to perform a significant number of jobs even if he had to avoid dangerous machinery.

Lastly, the Commissioner argues that Whittaker indicated that he had no difficulty walking, standing, or bending. He also stated that he chopped wood, shopped for groceries, cooked, and drove a car, although his night vision was limited. He also stated that he used the computer for thirty minutes at a time and watched television without difficulty. The ALJ noted that all of these activities required his vision and belied his claims that he was unable to work.

This court finds that the ALJ's decision was supported by substantial evidence and must be affirmed. As the ALJ noted, no medical source found Whittaker unable to work. The record did not show that he had any exertional limitations. It is undisputed that Whittaker cannot work with heights, reading material which requires the use of fine print, or work a job which requires driving. However, as the ALJ properly noted, his limitations did not significantly impact his ability to do all work. Although Whittaker cannot return to his previous jobs, the medical evidence shows that he is capable of doing other work. Moreover, his daily activities show that he is capable of working. He cut and split wood, trained his dog to herd sheep and ducks, shopped, cooked, cleaned, watched television and worked on his computer for

thirty minutes at a time. Accordingly, the ALJ's determination is affirmed since the determination is supported by substantial evidence.

**D. Request to Reopen Prior Claims**

Whittaker contends that the ALJ incorrectly denied his request to reopen his disability application dated November 9, 1995, which he did not appeal beyond the reconsideration level. The Second Circuit has held that in the absence of a colorable constitutional claim, the district court lacks subject matter jurisdiction over review of the Commissioner's refusal to reopen a prior final decision. *See Latona v. Schweiker,* 707 F.2d 79, 81 (2d Cir.1983). A final determination or decision may be reopened by a request from the claimant within four years of the date of the notice of the initial determination if "good cause" is shown. 20 C.F.R. § 404.988(b). The Commissioner's regulations provide that such a determination may be reopened more than four years later only if, among other grounds, fraud or similar fault exists, or to correct an error on the face of the evidence that was considered when the determination was made. 20 C.F.R. § 404.988(a)-(c). Lastly, judicial review is permitted only if there has been a final decision of the Commissioner made after a hearing. *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

In this case, Whittaker requested that his prior application be reopened. However, since he did not appeal beyond the reconsideration level and a final decision of the Commissioner made after a hearing did not occur, this court does not have subject matter jurisdiction to review the determination of the ALJ in this instance. Furthermore, Whittaker does not point to a colorable constitutional claim to show that his application should have been

reopened. Since the court lacks subject matter jurisdiction, the ALJ's decision not to reopen his prior application is not subject to judicial review.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED**, that the decision denying disability benefits is **AFFIRMED**, and the case against the Commissioner is dismissed; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Order upon the parties by regular mail.